cost to restore the loss as nearly as possible. If in this restoration a value is added, certainly this must be deducted from the costs of restoration, in order to estimate the loss by reason of the change. Any other doctrine would lead to the anomoly of allowing the owner to recover damages for that which is a benefit to him.

The result of this second mode of inquiry may be stated to be:

1. If after the changes which a prudent man would make to restore the premises to as good condition as they were in with reference to the new grade as they were in with reference to the old, they are of the same value as before the change of grade, the rasonable costs of such restoration would be what the owner is entitled to recover.

2. If under like circumstances, they are less valuable when restored, than before the change of grade, the amount of this diminution in value should be added to the costs of restoration, as the amount of recovery.

3. If under like circumstances, they are more valuable when restored than they were before the change of grade, there should be a recovery for the difference between the costs of restoration and this increase of value if less than the costs of restoration, but no recovery if more.

-----

(Hamilton County Common Pleas, 1901.)
WILLIAM UHRIG, a tax payer, v. THE VILLAGE OF READING.

-----

*Appointment of village deputy marshals, policemen and night watchmen—*

(1.) The statutes of Ohio vest the appointment of deputy marshals of villages in the village council, and the appointment of policemen and night watchmen in the mayor; the mayor cannot appoint deputy marshals nor can the council appoint night watchmen.

*Same—Ordinance not necessary—*

(2.) An ordinance is not necessary to appoint such deputy marshals.

*Same—Council cannot appoint night watchmen—*

(3.) A village council cannot by ordinance prescribing certain duties to be performed by certain persons therein named, designating them as deputy marshals, such duties being such as should be performed by night watchmen, appoint such persons to perform such duties under a title of deputy marshals, and such appointment being beyond the authority of the council is invalid.

*Same—Certificate of sufficient funds—*

(4.) Where a fund from which the salaries of certain village appointees are to be paid is partly raised from taxation and partly from the Dow tax, and is used as an entire fund, there can be no separation as to what part of the fund shall be used to pay the salaries, and it is necessary before such appointments are made that a proper certificate be made that there is sufficient funds in the treasury to meet the expenses of such appointees.

-----

SMITH, J.

In this case the court is of the opinion upon the points raised both on the original argument and on the rehearing, considering the agreed statement of facts and the petition and answer filed, that the injunction should be allowed against the Village of Reading.

Section 1847 of the Revised Statutes of Ohio provides for the appointment of deputy marshals, and vests this power in council. The duties of a deputy marshal are provided for by statute, and they are the same duties as those of the marshal. It is the duty of the mayor to appoint policemen or night watchmen. The mayor cannot appoint deputy marshals, nor can the council appoint night watchmen.

In this case council having undertaken by ordinance to prescribe certain duties to their appointees, although designating them deputy marshals, nevertheless, council undertook by this means to appoint night watchmen. An ordinance is not necessary to appoint deputy marshals, as the statute gives council that power. When, therefore, council undertook to pass an ordinance prescribing police duties to certain persons therein named, designating them as deputy marshals, it is evident that council was undertaking to appoint night watchmen. It would seem that it could make no difference by what name or title the appointees were designated, if, as a matter of fact, council undertook to fill a position which by law council had no authority to do, and such appointment would not be validated by the fact of the insertion of a title, such as "Deputy Marshall."

The court has been referred to what is said to be the opinion of Judge Hollister in the case of *Cox* v. *Village of Lockland,* in which it was held that it was necessary to certify that sufficient funds were in the treasury to meet the expenses of these appointees. The court is of the opinion that the Burns law, so-called, applies to the salaries of the appointees; and while, perhaps, the opinion of Judge Spiegel might indicate that the Burns law was not applicable, yet, as a matter of fact in this case, the fund from which the appointees are paid, is partly raised by taxation and partly from the Dow tax, and being used as an entire fund, there can possibly be

no separation as to what parts of the fund shall be used to pay these salaries. In fact, Judge Hollister, in his opinion, holds that it was necessary to certify that sufficient funds were in the treasury. So far as the question is raised upon the bonds not having been approved by the mayor, nor submitted to him, the court is of the opinion that this would not be a good ground to sustain plaintiff's petition, for the reason if the bond was given, the subsequent approval or ratification of it by any public officer would not invalidate it, and would not relieve the liability on the bond, as no doubt the bondsmen would still be held to their liability.

It follows, therefore, that the mayor can not appoint deputy marshals, nor can the council appoint policemen or night watchmen; and the court is of the opinion, from the evidence as set forth in the agreed statement of facts and the pleadings, that council, instead of appointing deputy marshals, has undertaken to appoint night watchmen.

The injunction, therefore, will be allowed.

*Gorman & Thompson* and *Frank Dinsmore,* for the injunction.

*W. W. Bellew,* contra.

---

(Montgomery Co., O. Common Pleas, 1901.)

THE DAYTON MANUFACTURING COMPANY v. THE METAL POLISHERS, BUFFERS, PLATERS AND BRASS WORKERS UNION NO. 5, OF DAYTON, OHIO, EDWARD J. LEO AND (240 OTHERS).

---

Every working man has a right to belong to a labor organization of he chooses. He has an equal right to refuse to belong, and the denial or either right, whether by the labor or the capitalistic organization, is a species of despotism.

Organization into unions by workingmen for the securing of better and uniform wages, and the use of persuasion to induce other workingmen to join the union, and to refuse to work except for the established wage, and the presentation of their cause to the public in newspapers or circulars, in a peaceable way and with no attempt at coercion are lawful.

But the boycotting of one who refuses to accede to the demands of the union is unlawful, where the means used to prevent persons from dealing with the persons boycotted are threatening, in their nature, and tend naturally to overcome, by fear or loss of property, the will of others, and compel them to do what they would not otherwise do, though unaccompanied by actual violence or threats of violence.

Injunction will lie to restrain a combination of persons from attempting to ruin complainant's business by bringing to bear upon his customers and employes intimidating and coercive means.

Courts of Equity will enjoin mere persuasion when it has for its object a malicious or unlawful end or persuading third parties to break a contract, or otherwise to act in violation of the legal rights of the plaintiff.

The members of the union having agreed among themselves to divulge none of its proceedings and to stand by the legal majority in all matters, are presumed to have full knowledge of all that was going on. It will not do for the non-participating members to say that they should not be held responsible because they did not personally engage in the boycott or picketing or the threats and violence. When a conspiracy is once formed among a number of individuals, the act of one is the act of all. It is equally true that the act of the legal majority of the union is the act of each of its members, and all will be included in the injunction.

---

KUMLER, J.

This cause came on for hearing for a perpetual injunction.

The petition in the case was filed on the 14th day of May, 1900, and alleges, in substance, that the plaintiff is a corporation, organized under the general laws of Ohio; that it is engaged in manufacturing car trimmings in brass and plated goods, locomotive headlights and other fabrics; that it has expended in buildings, machinery and tools two hundred and fifty thousand dollars, and has one hundred and fifty employes that work in said factory; that in carrying on said business it has a department in said factory known as the polishers and buffers department, in which it had constantly employed a number of metal polishers and buffers, and that it was necessary to have said department and men employed therein for the operation of its business; that nearly all of said defendants are members of said Union No. 5 which is a voluntary association, whose business and proceedings are carried on in secret; that on the 9th day October, 1899, Louis Kissinger and sixteen other defendants named in the petition were in the employ of plaintiff in the polishing and buffing department of said factory; that on said 9th day of October all of said seventeen defendants were discharged because the output of said department was not satisfactory to the general manager and other officers of the plaintiff; that since said 9th day of October the plaintiff has been compelled to have a large portion of the polishing and buffing re-